UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
LARRY S. FRANKEL, et al.,

                    Plaintiffs,

-against-

JAMES B. COLE, et al.,

                    Defendants.
------------------------------------------------------------------x

**NOT FOR PUBLICATION**
MEMORANDUM AND
ORDER

06-CV-439 (CBA)

AMON, United States District Judge:

      This case was originally filed on January 31, 2006, and an amended complaint was filed on May 26, 2007, by a class of bond purchasers and two subclasses against defendants alleging violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d), and various state laws. The defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). On December 6, 2006, the Court referred the motion to Magistrate Judge Ramon E. Reyes, Jr. for a Report and Recommendation ("R&R"). On April 20, 2007, Magistrate Judge Reyes issued an R&R, recommending that the complaint be dismissed in its entirety as untimely, and, in the alternative, as not adequately pled. On May 4, 2007, plaintiffs filed objections to the R&R. For the reasons set forth below, the Court finds that the objections with respect to timeliness are without merit and adopts that portion of the R&R recommending dismissal as untimely as the decision of the Court. Accordingly, the complaint is dismissed.

I.    **Facts**

      The reader is directed to the R&R for a more detailed review of the relevant facts in this case. For the purposes of this order, it is sufficient to recount that Defendants J.P. Morgan Chase

1

& Co., The Chase Manhattan Bank, N.A., Chase Manhattan Corporation, Chase Bank of Texas, N.A., Chase Securities Processing Corporation (collectively, "Chase") were the registered transfer agent, paying agent, custodian, and/or trust agent for the bonds at issue in the complaint. In March of 1998, Chase identified a discrepancy between the amount of cash on hand and outstanding bond issues totaling $46.8 billion ("Unpresented Difference"). (Am. Compl. ¶ 76.) Despite this, in August of 1998 and August of 1999, Chase filed two Form TA-2's with the Securities Exchange Commission ("SEC") indicating that the value of the Unrepresented Difference was "0." (Id. at ¶¶ 166-170, 173.) Furthermore, in October of 1999, Chase filed an amended TA-2 form indicating that an unpresented difference did exist, but only in the amount of $16,273,000. (Id. at 187-88.)

The SEC commenced an Administrative Proceeding against Chase in 1999, alleging that Chase had violated recordkeeping and reporting requirements. (Am. Compl. ¶ 109.) On November 8, 1999, Chase filed a 10-Q for the period ending September 30, 1999, stating that it had identified discrepancies in the computerized bond recordkeeping system. On November 9, 1999, several prominent newspapers covered the story, revealing for the first time the true magnitude of the Unpresented Difference. The Wall Street Journal, for example, reported that the discrepancy was more than $40 billion "– yes, billion –" and that "Chase is currently unable to confirm through a complete reconciliation of the relevant accounts that the value of the bonds that could potentially be presented for payment does not exceed the amount of cash on hand for payment of such bonds." Paul Beckett, *Chase Manhattan 'Checkbook' Goes Awry*, WALL ST. J., Nov. 9, 1999.

Subsequently, in September of 2001, Chase settled with the SEC. Under the terms of the

2

settlement, the SEC filed a complaint against Chase in the U.S. District Court for the Northern District of Illinois and settled it the same day. S.E.C. v. The Chase Manhattan Bank, No. 01-CV-7364 (N.D. Ill. 2001). The SEC complaint alleged, among other things, that Chase committed recordkeeping and reporting violations, that Chase identified but did not reconcile the discrepancies in its system, and that it did not reconcile the discrepancy until June 2000. (Am. Compl. ¶ 125.) Pursuant to the settlement, Chase paid the SEC a $1 million civil penalty (Id. ¶ 135), and agreed to cease and desist committing or causing further violations of the securities laws. (Id. ¶ 115-16.)

II.     **Discussion**

The statute of limitations for a RICO action is four years. The parties dispute when the statute of limitations was triggered which, in this case, depends on the time at which the plaintiffs were put on inquiry notice of the fraudulent scheme complained of in the RICO count. Inquiry notice triggers the duty to inquire, or, barring any inquiry,[1] triggers the beginning of the statute of limitations period. (See R&R at 11-12 (citing the applicable law).)

Magistrate Judge Reyes found that the plaintiffs were put on inquiry notice of the fraudulent scheme as early as November 1999, when the above mentioned news articles were published about the Unpresented Difference, and certainly by September of 2001 when Chase's settlement with the SEC was made public. Thus, plaintiffs' complaint, filed in 2006, was untimely. (R&R at 19.) Magistrate Judge Reyes noted that plaintiffs "need not be able to learn the precise details of the fraud, but...must be capable of perceiving the general fraudulent scheme

---

[1]Nowhere do the plaintiffs argue or allege that they made any such inquiry. Accordingly, the statute of limitations in this action began to run on the date on which the plaintiffs first had a duty to inquire. Shah v. Meeker, 435 F.3d 244, 249 (2d Cir. 2006).

3

based on the information available to them." (R&R at 12, citing to <u>In re Initial Public Offering Sec. Litig.</u>, 341 F.Supp.2d 328, 345 (S.D.N.Y. 2004).) He further noted that the gravamen of the plaintiffs' complaint was that "Chase engaged in a scheme since 1995 to defraud plaintiffs by intentionally concealing that it had only approximately $700 million in cash to pay $47 billion in outstanding bonds." (R&R at 13, citing to Am. Compl. ¶ 460, 462.) The complaint alleges that the individual defendants "employed devices, schemes, and artifices to defraud and engaged in acts, practices and a course of conduct in an effort to conceal: (a) that the unpresented discrepancy was $46.8 billion; (b) that Chase had about $700 million in cash to pay $47 billion in outstanding bonds per its books and records; and (c) that Chase reconciled the $46.8 billion discrepancy by improperly deleting $46.8 billion in outstanding unpresented called or matured bonds from its accounting records – a process known as force balancing." Since the first two aspects of the plaintiffs' alleged fraudulent scheme were extensively covered in the news, Magistrate Judge Reyes concluded that the plaintiffs were on inquiry notice by November of 1999.

Plaintiffs have filed objections to the R&R. Primarily, plaintiffs argue that Magistrate Judge Reyes was wrong when he concluded that plaintiffs were on inquiry notice of the fraudulent scheme as early as November of 1999. (Objections at 2.) Plaintiffs argue that part of the fraudulent scheme they allege to have occurred was the deleting by defendants of unpresented bonds which had been mature for three years without any activity. (Id.) Therefore, they argue that since the media coverage and SEC settlement only dealt with the accounting irregularities, not the deleting of unpresented bonds, those documents did not place them on inquiry notice of the fraudulent scheme they allege. Their argument is without merit.

4

It is well-settled that "[a]n investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." Dodds v. Cigna Securities, Inc., 12 F.3d 346, 352 (2d Cir. 1993); see also Salinger v. Projectavision, Inc., 972 F. Supp. 222, 229 (S.D.N.Y. 1997) ("The plaintiffs need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them."). For instance, in LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148 (2d Cir. 2003), the plaintiffs alleged three areas of improper business practices. First, they alleged that the defendant insurers had implemented reserve policies that had the deliberate effect of under-reserving for potential claims. Second, they alleged that the defendants' information systems were grossly inadequate. And third, they alleged that the defendants had engaged in a type of pyramid scheme to cover up revenue shortfalls which involved acquiring other insurance companies, offering policies at predatory prices, and using the premiums generated to pay claims on existing policies. Id. at 150. The court held that the plaintiffs were put on inquiry notice as of December 1998, by virtue of three consecutive and substantial reserve charges ($17.5 million, then $40, then $139), an article in the National Underwriter which documented the defendant's reserve problems, and an earlier lawsuit which alleged that the defendants' reserves for losses were grossly inadequate. See id. at 151, 155. The court reached this conclusion despite the fact that these "storm warnings" pertained principally to the failure to have adequate reserves. See id. at 151. The court endorsed the view of the lower court that where the warnings pertain to the focus of the alleged fraud, in that case the inadequate reserves, they can be said to relate as well to later misrepresentations pertaining to the fraud. Id. at 155. In this case, the alleged deletions of the unpresented bonds relate directly to the defendants' concealment of the fact that it had

5

inadequate funds with which to pay the outstanding bonds.

Similarly, in Staehr v. Hartford Financial Services Group, Inc., 460 F. Supp. 2d 329 (D. Conn. 2006), the plaintiff alleged that the defendant had engaged in undisclosed contingent kickback arrangements, had manipulated certain bidding processes, and had misled investors regarding these practices and had violated generally accepted accounting principles ("GAAP") in carrying them out. Id. at 332. The court found that certain earlier lawsuits, press stories, and regulatory filings gave rise to inquiry notice. The plaintiffs argued that "not all of the fraudulent activities they allege in the complaint are disclosed in the previous lawsuits and news accounts and that they cannot have been placed on notice as to these activities. In particular, the allegations of bid-rigging activities, violation of GAAP standards and the misleading of [the defendant's] investors are not reported." Id. at 338-39. The court rejected their argument, quoting Dodds, and concluding that inquiry notice as to the kickbacks was sufficient to put them on notice of the entire fraud being perpetrated. Id. at 339.

The decision in In re Global Crossing, Ltd. Securities Litig., 313 F. Supp. 2d 189 (S.D.N.Y. 2003) further supports the conclusion that the plaintiffs here were on inquiry notice as of November 1999. In Global Crossing, plaintiffs principally alleged two fraudulent activities: reporting as immediate cash revenue income that should have been booked over 25 years, and reporting cash revenue income from certain "reciprocal swaps" with other companies that essentially ended up returning the money and resulted in no actual revenue. Id. at 194. There, the court concluded that inquiry notice sufficiently arose from a single article published in Fortune magazine, which detailed the problem in the industry regarding reciprocal swaps but said nothing about the defendant improperly reporting immediate cash revenue. Id. at 200-01.

6

Moreover, as the plaintiffs pointed out in an attempt to argue that they had not been put on inquiry notice by the article, the article failed to disclose a variety of details about even the reciprocal swaps aspects of the fraudulent scheme. They noted for example that:

> the...disclosures say nothing about the pre-July 1999 mismatch of costs and revenues, the Hindery memo, the flouting of [Accounting Principles Board Opinion No. 29], the misleading nature of Global Crossing's disclosures about [Financial Accounting Standards Board Interpretation No. 43], creation of the deceptive measurements of cash revenue and adjusted [Earnings Before Interest Taxes, Depreciation, and Amortization] or the last minute, end of quarter swaps for economically worthless assets.

Id. at 201 (internal quotations omitted). The court rejected the notion that inquiry notice was lacking because only certain aspects of the fraud alleged were referenced in the article. The court observed that "[p]laintiffs do not explain why, absent these details, the Fortune article did not trigger a duty to inquire. More importantly, this argument is legally insufficient, as '[a]n investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice.'" Id. (quoting Dodds).

Accordingly, in view of this persuasive authority, plaintiffs' argument that they were not on inquiry notice because the media coverage and SEC settlement did not specifically allude to the alleged deleting of unpaid bonds is unavailing. As the above-cited case law makes clear, the focus is not on what they did not know (which in this case is relatively little when considering the alleged fraudulent scheme as a whole), but rather on whether what they did know was sufficient to trigger a duty of inquiry on their part.

In this case, as discussed at length by Magistrate Judge Reyes, plaintiffs were aware of two TA-2 forms (August 24, 1998 and August 5, 1999) which claimed a value of securities records difference existing for more than thirty days of $0. Plaintiffs were also aware of a

7

subsequent TA-2 form (dated October 18, 1999) which placed that value (as of June 30, 1999—prior to the August 5, 1999 form claiming $0) at $16,273,000. Moreover, in November of 1999, it became widely disseminated public knowledge that the actual difference existing was well over $40 billion, and at least one report explicitly noted that this discrepancy "raises prickly questions about [Defendant's] internal tracking systems". (R&R at 13.) Courts have routinely held that suspicious contradictions like this constitute sufficient "storm warnings" to give rise to inquiry notice. See, e.g., Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 701-02 (2d Cir. 1994) (finding inquiry notice present where defendant stated that a public offering would be conducted on an "all-or-none" basis but where surrounding circumstances indicated that this was not the case); Greenburg v. Hiner, 173 Fed. Appx. 367, 370-71 (6th Cir. 2006) (inquiry notice found present where reports of solid financial health were contradicted by a filing for bankruptcy for the inability to keep up with liabilities); In re Exxon Mobil Corp. Securities Litig., 387 F. Supp. 2d 407, 418 (D.N.J. 2005) (inquiry notice occurred where "the public information regarding the impairments taken by other oil and gas companies directly contradicted Exxon's actions of not reporting the SFAS 121 impairments"); In re Merrill Lynch Ltd. P'ships. Litig., 7 F. Supp. 2d 256, 267 (S.D.N.Y. 1997), aff'd, 154 F.3d 56 (2d Cir. 1998) ("Courts in this Circuit have held that clear evidence that an investment asset has declined in value or has been subject to an artificially inflated estimate of its value, in direct contradiction of representations made to the plaintiff at the time of sale, constitutes inquiry notice as to the probability of fraud." (internal quotations omitted)); Butala v. Agashiwala, 916 F. Supp. 314, 318 (S.D.N.Y. 1996) (finding inquiry notice to be present where several events contradicted representations made by the defendants).

8

In addition to being on notice of these contradictions regarding the Unpresented Difference, plaintiffs were also on notice that Chase was unable to confirm whether it had enough cash to pay the outstanding bonds and that it was being investigated by the SEC. (R&R at 14.) Moreover, by 2001, still more than four years prior to the filing of this lawsuit, plaintiffs were on notice that Chase would be paying a $1 million fine to the SEC for record-keeping and recording violations and would be subject to a cease and desist order. (R&R at 9.) Therefore, the Court agrees with Magistrate Judge Reyes that all of these factors in the aggregate more than constitute sufficient "storm warnings" to give rise to inquiry notice. Plaintiffs arguments to the contrary are without merit.

Plaintiffs also argue that they were not put on inquiry notice because Chase issued reassuring statements that negated any duty to inquire that arose from the SEC investigation and related media coverage. They cite to several public statements contained in various articles to the effect that no customer funds had been lost as well as statements that the reconciliation project would fix the problem. As a result of these pronouncements, plaintiffs argue that they were not on notice of the possibility that bonds would be deleted from the system. (Objections at 5-8.) Magistrate Judge Reyes properly noted that the three factors to be considered when analyzing reassuring statements are (1) how significant the company's disclosed problems are, (2) how likely they are of a recurring nature, and (3) how substantial are the reassuring steps announced to avoid their recurrence. (R&R at 16.)

With respect to the first consideration, plaintiffs concede that "Chase's disclosed problems were significant." (Objections at 7.) Plaintiffs do argue that the second and third factors support their argument that Chase issued sufficient reassuring statements to defeat

9

inquiry notice. First, with respect to the reassuring statements, they point to what was essentially the same statement, rehashed several times, to the effect that no bondholder funds had been lost. (Objections at 6.) Additionally, with respect to the possibility of recurrence, plaintiffs point to general statements to the effect that "the conditions giving rise to the alleged violations have since been addressed."[2] (Objections at 7-8.) Statements of this nature do not rise to the level necessary to relieve a plaintiff from the duty to inquire. See LC Capital Partners, LP, 318 F.3d at 155-56 (general statements that the defendant had "paid the bill" and that the problem was "now behind us" held to be insufficient).

Moreover, contemporaneous with some of Chase's statements that "no customer funds had been lost" were statements undermining that contention. For instance, an article in Reuters noted that Chase said in its quarterly SEC filing that "it was unable to confirm it had cash on hand to meet potential bond payments until the reconciliations were fixed." *SEC Probes Chase Over Bond Recordkeeping Discrepancy*, REUTERS, Nov. 9, 1999.[3] This is directly at odds with the reassuring statements (which assured investors that Chase had sufficient funds to cover their investments) and suggests that the problem—which had built up over ten years due to fundamental defects (R&R at 16)—was likely to continue. As the caselaw cited above

---

[2]The only more specific statements cited by the defendant are particular remedial steps outlined in the September 2001 SEC settlement. (Objections at 8.) However, these "reassuring statements" were not made until over two years after the storm warnings began to gather, and in any event were hardly made voluntarily. Nevertheless, to whatever extent the SEC settlement made it less likely that the problem would recur in the future, the Court holds that the remaining factors still counsel heavily in favor of inquiry notice.

[3]Similar statements about Chase's potential inability to meet bond payments were published in the Wall Street Journal (R&R at 6) as well as Chase's own 10-K, filed on March 13, 2000 (Id. at 7.)

demonstrates, contradictions of this sort serve to put a plaintiff on inquiry notice, they do not mitigate against it. Accordingly, and for the reasons set forth in Magistrate Judge Reyes' R&R (at 16-17), the so-called reassuring statements alleged here are insufficient to support the conclusion that plaintiffs' duty to inquire ceased.

Finally, plaintiffs argue that for those plaintiffs whose original paying agent was Manufacturers Hanover Trust or Chemical Bank, the media coverage of Chase's problem with the Unpresented Difference would not put them on notice of the alleged fraud. (Objections at 9-10.) Magistrate Judge Reyes concluded that this argument was without merit, noting, inter alia, that the bondholders were on notice of the well-publicized mergers between Chemical and Manufacturers Hanover Trust and between Chase and Chemical Bank, based on a November 9, 1999 Wall Street Journal Article which asserted that Chase had inherited record keeping problems from Chemical Bank, the identification of Chemical Bank as Chase's predecessor Chemical Bank, and other "widespread press coverage". (R&R at 18.)

Plaintiffs argue that the "press coverage" cited by Magistrate Judge Reyes was not widespread. They assert that "when the Chemical/Chase merger was mentioned in the press, it was only briefly mentioned as an aside in one article." (Objections at 10.) This assertion is simply wrong. Chase has provided several articles from major media outlets that covered the merger in detail.[4] (Curnin Supplemental Aff. Exs. B-L.) Therefore, Magistrate Judge Reyes was correct to conclude that this argument was without merit.

---

[4]The Court may take judicial notice of published articles for the fact of publication on a motion to dismiss. See In re Yukos Oil Co. Securities Litig., No. 04 Civ 5243 (WHP), 2006 WL 3026024 at *21 n.10 (S.D.N.Y. Oct. 25, 2006) (citing Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)); In re Merrill Lynch & Co., Inc. Research Reports Securities Litig., 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003).

III.	**Conclusion**

Accordingly, the RICO claims are time-barred. The Court declines to exercise supplemental jurisdiction over the state law claims because it has dismissed all of the claims that it has original jurisdiction over. 28 U.S.C. § 1367(c)(3). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:	Brooklyn, New York
	September 7, 2007

Carol Bagley Amon
United States District Judge